# CIRCUIT COURT OF BOTETOURT COUNTY

Advanced Transportation
and Logistics, Inc.

v.

Botetourt County
and Botetourt County
Board of Supervisors et al.

October 5, 2009

Case No. CL08-199

BY JUDGE THOMAS H. WOOD

The parties to this proceeding are Advanced Transportation and Logistics, Inc. (ATL), a Virginia Corporation, with its principal place of business in Botetourt County, Virginia. ATL is owned by Carl Benson. Botetourt County (County) is a political subdivision of the Commonwealth of Virginia and is governed by a Board of Supervisors (Board). After this proceeding was pending but before the hearing in July of 2009, five companies which are garbage-collection companies operating in Botetourt County intervened (Intervenors).

The County provides garbage-collection services to its citizens through a franchise system in the County whereby Class 1 (residential) and Class 2 (commercial) customers are serviced. The County is divided into five regions. After a public bidding process which is governed by Chapter 20 of the Botetourt County Code, an exclusive franchise is granted for each of the five areas. The "franchisees" are required to provide services to the customers in the franchise area who want it. No citizen is required to use the garbage-collection service. The Intervenors in this case are franchisees.

Prior to awarding franchises, the County publicly solicits proposals, prospective franchisees submit bids, and the County subsequently sets the rate the franchisees may charge.

There is a third class of service, which is not regulated by the County and is primarily a commercial, roll-off type service.

Prior to July 1, 2002, the County solicited proposals. After receiving the proposals, the County awarded franchises and entered into contracts with the franchisees. Paragraph 8 of the contract required the "collector" (franchisee) to comply with all County landfill regulations. This paragraph further charged each franchisee with knowledge of the County's solid waste ordinance and incorporated by reference "Section 5. Scope of Services" of the "Request for Proposals for Solid Waste Collection Services. . . ."

Of significance was the requirement that each franchisee was to dispose of the garbage collected by it at a landfill owned and operated by the County and located in the County. In order to use the landfill, the franchisee had to pay a "tipping fee" of $27.50 per ton. The franchise period began July 1, 2002, and expired on June 30, 2009.

The Department of Environmental Quality (DEQ) regulates the operation of landfills. All localities in Virginia are required to file a plan with DEQ covering solid waste disposal for the next twenty years. These have to be periodically updated. The County had operated its own landfill for some time, and, in 2003, the County hired an engineering firm, Draper Aden, to assist with an update of its plan. At this time, the County was using a relatively small area designated as Cell 2, but it also owned an adjoining 68-acre tract which it intended to use for expansion in the future. The 68-acre area did not have a current permit. By report dated November 13, 2003, Draper Aden gave the County an estimate that Cell 2 would reach capacity in the spring of 2012. In another report dated December 9, 2003, Draper Aden estimated that the 68-acre area, if developed and permitted, would give the landfill an additional 55 years of life expectancy.

In April of 2005, a large cave was found beneath Cell 2-B. This cave was symptomatic of karst topography or geology which is characterized by limestone, caves, and free-flowing underground streams. The potential for the spread of contamination from a landfill prohibits the operation of a landfill where such geology is present. More tests were done, and, after the dust settled, Draper Aden, an acknowledged expert, was of the opinion that the permitted area would last until 2008. Draper Aden then recommended that the County use a transfer station alternative to meet its future waste-disposal needs. A transfer station is a point to which collected garbage is delivered to be thus delivered to a landfill operating in another area of the Commonwealth.

The County explored developing its own transfer station and, in addition, considered joining the Roanoke Valley Resource Authority. Neither alternative was deemed to be viable largely because of significant expense. Further, there was a concern as to whether a permit could be obtained for its own transfer station in the short time remaining before the landfill would close.

The last advice to the County, in August, 2007, from Draper Aden, was that the life expectancy of the landfill, as modified, would extend no longer than March 2009, at which time it would have to be closed. The County hoped to avoid a substantial cost that would be incurred in closing the landfill and, in addition, the County very much wanted to keep some landfill capacity to use in the case of a natural disaster. Accordingly, the County entered into a solid-waste disposal agreement with the City of Salem in November of 2007, effective January 1, 2008. The landfill was closed to the franchisees on March 1, 2008. As a consequence of the need to use the Salem Transfer Station, the tipping fees paid by the franchisees went from $27.50 per ton to $45.00 per ton for residential waste and to about $49.50 per ton for commercial waste. In addition, there were other substantial costs to be necessarily incurred by the franchisees in delivering the garbage to the Salem Transfer Station as opposed to the local landfill. The impact upon the franchisees is demonstrated by Defendants' Exhibits 52-56 and really is not in dispute. Absent a significant increase in the fees paid by residential and commercial customers, at least some of the franchisees would have been called upon to operate at a substantial loss if they were to complete the seven-year term originally specified in the 2002 contract which did not expire until June 30, 2009.

There were, at this point, several options open to the County, some of which have been mentioned above. After conferring with and receiving input from the franchisees, the County determined to modify the existing contracts to change to the Salem Transfer Station from the Botetourt County Landfill and to raise Class 1 rates from $18.00 per month to $21.00 per month, and Class 2 rates from $4.20 per cubic yard to $5.50 per cubic yard. In addition, there were a number of other fairly significant requirements imposed upon franchisees with respect to the capabilities of their equipment. Lastly, the expiration date of the 2002 contracts was extended from June 30, 2009, to December 31, 2012. The extensions obviously were an attempt to allow the franchisees to recoup the additional costs involved in the additions to the contracts and the additional costs associated with transporting waste to the Salem Transfer Station. As a result of the cooperation between the franchisees and the County and the modifications and extensions made to the 2002 contracts, there has been no interruption in the collection and

disposal of waste in the County. It is anyone's guess what would have happened had the County not done what it did. This was a true emergency situation.

Initially, ATL brought this suit against the County. Judge Malfourd W. Trumbo sustained a Demurrer to that initial Complaint; an Amended Complaint was filed by ATL, and the County Demurred to the Amended Complaint. The issues raised in that Demurrer were the standing of ATL to bring this proceeding, the County arguing that ATL was not a "potential bidder or offerer" and that the Virginia Public Procurement Act (VPPA) did not apply to the Board's action in this case because the County had adopted a solid waste ordinance pursuant to Va. Code §§ 15.2-927, 15.2-928, 15.2-930, 15.2-931 (2008). By opinion letter dated October 6, 2008, Judge Trumbo overruled the County's Demurrer.

At the time of Judge Trumbo's opinion, the franchisees/intervenors were not parties to this proceeding. After Judge Trumbo recused himself, a hearing was held by me to consider the Petition to intervene. At some point during this hearing, I observed that it was poor policy for me to reconsider decisions made by Judge Trumbo before he had to get out of the case. I still would agree with that observation as a general principle, but, in the case at bar, the intervenors/franchisees ought to be able to raise these issues and, in fact, they have. As a consequence of all of this, the Court has undertaken to consider at length the opinion of Judge Trumbo and the authority cited by him in support of his opinion, and the Court has come to the conclusion that Judge Trumbo's opinion is correct. Accordingly, the Court will adopt the opinion of Judge Trumbo and incorporate it herein as a part of this opinion. The original of that opinion is contained in the Court file. Because Judge Trumbo's opinion was based upon the sufficiency of the pleadings, the Court will need to mention some of the evidence which supports the facts assumed to be correct by Judge Trumbo.

The Court believes and finds that ATL is a prospective bidder or offerer. Mr. Benson's testimony, and his testimony is not in the least contradicted, establishes that Benson and ATL have the financial capability to acquire in short order all of the equipment necessary to carry out the duties of a Class 1 and/or Class 2 franchisee. To be sure, at the time it lodged the protest with the County, it was not in the business of collecting and disposing of waste in Botetourt County or in any other county or city. It

was, however, in the trucking business and had been for over ten years. It certainly ought to have expertise with respect to the efficient operation of a business which requires the operation of trucks. Further, as ATL points out, if a prospective bidder had to be in the business of collecting garbage in Botetourt County in order to qualify as a prospective bidder or offerer, no one other than an incumbent would ever be qualified, given the system in use in the County.

The Court also believes and would hold that the Virginia Public Procurement Act does apply to Botetourt County and its selection of franchisees. It is clear from the enabling statute cited above and from the language and holding in the case of *Concerned Residents v. Gloucester County*, 248 Va. 488, 449 S.E.2d 787 (1994), that the County has a great deal of leeway in deciding how it wants to handle waste disposal. It could create a Service Authority to provide the service or it could provide the service itself, and, in either case, there would be no competitive bidding. Where, as here, the County chooses to use service providers from the private sector to dispose of waste, those service providers must be chosen by a competitive bidding process. Further, it is noteworthy that the County's own solid waste ordinance, Chapter 20, Section 20-25, clearly envisions a competitive bidding process.

At various points in their joint proposed findings of fact and conclusions of law, the defendant and the intervenors refer to the Board's action in March of 2008 as "modifications" or "amendments" to the existing contract. The Court would agree that the 2002 contracts were subject to modification depending on the nature of the modification. However, both the VPPA, Virginia Code § 2.2-4309(B), and the County Purchasing Manual Provision 3.3 provide for extensions of the terms of contracts in order "to allow completion of any work undertaken but not completed." Intervenors argue that the extension of the term of the contracts to allow the intervenors to amortize their additional expenses incurred in having to haul to the Salem Distribution Center is the equivalent of an extension to allow completion of work undertaken. Intervenors cite no authority for this suggestion, and I do not believe it is appropriate. There clearly was no work to be undertaken but not completed beyond June 30, 2009.

Lastly, the Court would here mention Virginia Code § 2.2-4303(F) solely for the purpose of pointing out that no party to this proceeding has required the Court to consider it.

There is no question but that this act by the County in extending these contracts or in entering into new contracts is entitled to great deference from this Court and must be presumed to be valid. However, where, as here, that

action violates the applicable State and even its own ordinances, the Court is compelled to rule that the County's action in entering into these agreements effective March 1, 2008, is contrary to law and is void.

This case has been very difficult for the Court because I believe the County's concern as to the consequences of not doing what they did was genuine and they undertook the action they took in good faith. However, I see no choice but to make the decision I did.